**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | |
| Charetta N. Aboraia, | ) | Case No.: 04-04941-BGC-7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | | |
| Charetta N. Aboraia, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | A. P. No.: 08-00218-BGC |
| | ) | |
| USDA Food and Nutrition Service; and | ) | |
| the State of Alabama Department | ) | |
| of Human Resources, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION ON COMPLAINT**
**TO DETERMINE DISCHARGEABILITY OF A DEBT**

### I. Background

Ms. Aboraia filed a Chapter 13 case in this Court on June 4, 2004. She converted that case to Chapter 7 on October 15, 2005. The Chapter 7 trustee filed a "no-asset" final report on December 22, 2005. A discharge was granted on February 1, 2006. The case was closed on March 29, 2006.

For a majority of the time in her case, Ms. Aboraia received concurrent subsidies from the Illinois Department of Children and Family Services (DCFS) and the Alabama Department of Human Services (DHR). The State of Alabama calculates that from January 2004 through December 2005, it paid Ms. Aboraia $8,631 in food assistance, but contends that if it had known about the Illinois subsidies, it would have paid only $1,191. Alabama asserts a claims in this case for the $7,440 difference and contends that this debt may not be discharged.

Ms. Aboraia represents that she repaid about $2,414 of the $7,440, leaving a balance of about $5,026. She contends that some part of the $7,440 is dischargeable and what is not discharged is satisfied by the amount already made.

## II.  Pending Matters

The specific matters before the Court are:

1.      The <u>Complaint to Determine Dischargeability of USDA Food and Nutrition Service Claim</u> filed September 4, 2008, by the debtor, Ms. Charetta N. Aboraia, A.P. Docket No. 1;[1]

2.      The <u>Amended Complaint to Determine Dischargeability of USDA Food and Nutrition Service Claim</u> filed January 29, 2009, by Ms. Aboraia, **adding the State of Alabama as a defendant**, A.P. Docket No. 15;

3.      The <u>Counterclaim</u> filed on April 23, 2009, by the Alabama Department of Human Resources (DHR), A.P. Docket No. 19;

4.      The <u>Second Counterclaim</u> filed on May 6, 2009 by DHR, A.P. Docket No. 20;

5.      The <u>Third Counterclaim</u> filed on May 6, 2009, by DHR, A.P. Docket No. 21; and

6.      The <u>Fourth Counterclaim</u> filed on August 7, 2009, by DHR, A.P. Docket No. 34.

After notice, a trial was held on all matters on July 29, 2010.  Appearing were: the plaintiff, Ms. Charetta N. Aboraia; Mr. Charles Cleveland and Ms. Rebecca Bozeman, the plaintiff's attorneys; and Mr. James Edward Long, the attorney for the defendant.

The matters were submitted on the testimony of Ms. Aboraia, Ms. Annette Wilson, Mr. Kwakou Muata, Ms. Camela Griffin, Ms. LaNetra Belser, and Mr. Thomas G. Stuart, and on other evidence.

## III.  The Parties' Positions

### A.  State of Alabama

The State of Alabama contends that Ms. Aboraia was not entitled to all of the assistance it paid to her because she was receiving the concurrent payments from the

---

[1] The debtor-plaintiff proceeded against the State of Alabama only. Because the USDA was not formally served and did not participate in this proceeding, the Court finds that as a formal matter, the complaint against USDA should be dismissed.

2

State of Illinois. Specifically, Alabama DHR argues that Ms. Aboraia committed fraud in receiving payments from the State of Alabama because she: (1) intentionally did not provide information about the concurrent Illinois payments in the reports she was required to make to DHR; or (2) intentionally submitted false information on those forms or in conversations with DHR representatives regarding the Illinois concurrent payments.

Based on those facts, the State of Alabama concludes that its food assistance payments to Ms. Aboraia are nondischargeable pursuant to sections 523(a)(2)(A), 523(a)(2)(B), and 523(a)(5) of the Bankruptcy Code, and that the debt for those payments should be afforded priority status under section 507(a)(1)(B) of the Code.

## B. The Debtor

Ms. Aboraia wants a part of her debt to the State of Alabama included in her Chapter 7 case discharge. She contends that whatever is not discharged would be satisfied by way of the reimbursement payments she made. In addition, Ms. Aboraia wants a refund of anything left over.

Specifically Ms. Aboraia contends that: (1) of the $7,440 Alabama paid to her, $6,670 was paid pre-conversion (before October 15, 2005, the date she converted her Chapter 13 case to Chapter 7), and thus would be dischargeable; (2) of the $7,440 Alabama paid to her, $770 was paid post-conversion (after October 15, 2005), and while it may not be dischargeable, it was satisfied by the payments she made to DHR before instituting the present proceeding; and (3) she is entitled to a refund of any amount paid in excess of the amount sufficient to satisfy the post-conversion portion of her debt to DHR.

Also at issue is Ms. Aboraia's failure to list the DHR food assistance overpayments in either the schedules she filed with her original Chapter 13 petition or the documents she filed in the converted case. Ms. Aboraia argues that she did not list them because DHR: (1) had not determined that she had been overpaid; (2) had not notified her that she had been overpaid; and (3) had not began to collect the overpayment until after the current case was filed.

## IV. Findings of Fact

All of the pertinent facts come from the testimony and associated exhibits. Six witnesses testified. Their testimonies are summarized below.

## A. Ms. Aboraia's Testimony

Ms. Aboraia is about 42 years old. She has multiple sclerosis. She has been legally blind since 1999 or 2000. She is disabled and receives monthly social security disability payments. Plaintiff's Exhibit 3. She is unable to walk freely and attended the trial of these matters in a wheelchair.

Case 08-00218-BGC   Doc 62   Filed 02/06/12   Entered 02/06/12 12:34:49   Desc Main
Document     Page 3 of 31

Ms. Aboraia has three children. One is a birth child, a 17 year old son. Two are adopted. The first adopted child, her aunt's three year old daughter, came to live with her in 1988 when Ms. Aboraia was about 19 years old. The second, her aunt's two-week old son, came to live with her in 1989. At the time Ms. Aboraia was living in Chicago. Ms. Aboraia became their foster parent in 1991 when she was about 21 years old. She adopted both on October 15, 1999.

While in Illinois, Ms. Aboraia received foster parent subsidies from DCFS for the two children. After she adopted them, she received adoptive parent subsidies from DCFS in lieu of the foster parent subsidies. When she moved to Alabama, she continued to receive adoptive parent subsidies from DCFS. She testified that from 2002 through 2005 she received monthly subsidies of $444 for each child, or $888 per month from DCFS. For that same period, she received food assistance from DHR.

Receipt of DHR food assistance from the State of Alabama required Ms. Aboraia to file a yearly application. Because she was legally blind, her minor daughter helped her complete those applications. Her daughter would read the application questions to her. Ms. Aboraia would provide answers verbally. Her daughter would then write those answers on the applications.

Ms. Aboraia testified that from time-to-time she received calls from DHR representatives asking her about the food assistance applications she submitted. She testified about one call in 2005. The DHR representative asked her specifically about the money she was receiving from DCFS. Ms. Aboraia admitted that she was receiving assistance from DCFS. The representative indicated to her that the assistance she was receiving from DCFS was "a problem," and that the representative referred to the DCFS adoptive parent subsidies as "income." Other testimony explained that anyone filing applications for, and receiving, food assistance from DHR, was required to list all "income" on the applications.

Ms. Aboraia testified that she tried to explain to the Alabama representative why those subsidies were not "income." The reasons she gave were those that DCFS had given her. Those reasons were the subsidies would not be considered "income" because: (1) they had to be used strictly for the care of her foster children; (2) they were subject to change and therefore not considered "stable;" and (3) they would be insufficient in amount to reimburse her for what she was paying to support the children.

Ms. Aboraia testified specifically:

When I first got the kids as foster children, the state, it was called DCFH [*sic*] – Department of Children and Family Services – stated when you receive these foster children, do not consider this to be an income because it is not stable, first of all, the situation may change and they don't pay you enough according to what you actually spend on your child period.

Transcript at 166.

Based on DCFS representatives' opinions, Ms. Aboraia never considered the DCFS adoptive parent subsidies as "income," and she never considered listing those subsidies as "income" on her Alabama food assistance applications. She added, "It was said to not include it as an income, you couldn't file taxes on it." Transcript at 35.

Ms. Aboraia's testimony about her conversations with DCFS representatives is supported by an April 24, 2009, letter from Mr. Corey Wiegand, Administrator of the Central Payment Unit of DCFS, to Ms. Aboraia's bankruptcy attorney. Plaintiff's Exhibit 4. Mr. Wiegand confirmed in that letter that: (1) Ms. Aboraia became a foster parent in Illinois on May 31, 1991; (2) she became an adoptive parent on October 15, 1999; (3) she received monetary assistance from DCFS to be used for the care of those foster and adopted children; (4) she was no longer receiving any such assistance; and (5) that the assistance she received was not "income." Id. Regarding the income, the exact quote is:

> As foster and/or adoptive parents for the Department of Children & Family Services, the money they receive is for the care of the children. Under no circumstances is this reimbursement to be considered as income as stated in IRS Ruling 74-153 and Public Law-473.

Id. (Emphasis added).

According to Ms. Aboraia, before the 2005 conversation in which she was confronted by the DHR representative about the DCFS payments, no one had ever asked her specific questions about any assistance she may have been receiving to help support her two adopted children. Similarly, she had never informed DHR, either verbally in her conversations with its employees, or in writing on her several applications, that she was receiving monetary assistance from DCFS as reimbursement for the care provided those children.

Ms. Aboraia testified that she used the DCFS $888 monthly allotment to care for her children. In her mind that included paying utility bills, paying rent, and buying food. She said that over the years she spent twice as much as she received from DCFS in raising her adopted children. She said that many times during those years she could not work because of her health problems. Sometimes that condition lasted for weeks or months. She said that she never intentionally put false information on the Alabama food assistance applications and truthfully answered the questions asked her by DHR representatives.

Ms. Aboraia said that she stopped receiving $444 of the $888 DCFS benefits in March 2006 when her adopted daughter turned 18 and moved away from home. She said she stopped receiving the remaining $444 in November 2008 when her adopted son turned 18 and moved away from home.

And finally, Ms. Aboraia testified that her Alabama DHR food assistance was terminated after the 2005 conversation. Ms. Aboraia was thereafter notified by DHR that she had received an overpayment of food assistance which she would have to pay back.

## B. Ms. Annette Wilson's Testimony about
## Ms. Aboraia's 2002 Food Assistance

Ms. Annette Wilson worked in DHR's Jefferson County, Alabama food assistance office in 2002. She testified about Ms. Aboraia's 2002 food assistance application and process.[2]

Ms. Wilson's duty as a DHR case worker was to determine whether applicants were eligible to receive food assistance. She processed Ms. Aboraia's 2002 food assistance application which is signed by both Ms. Wilson and Ms. Aboraia. DHR Exhibit 2.

According to Ms. Wilson's testimony, the process to determine food assistance eligibility in 2002 began with an application. After an application was filed, a food assistance worker would conduct an in-person interview with the applicant. That interview included a review of the applicant's responses to every question on the application. Pursuant to that procedure, Ms. Wilson interviewed Ms. Aboraia on January 15, 2002, in the former's office. At that interview, they reviewed Ms. Aboraia's application. See DHR Exhibit 2.

DHR food assistance applications are color coded. Blue sections were for the DHR worker to record the applicant's responses to the worker's questions. DHR workers recorded those responses in red ink. This distinguished what the worker had written in the white sections of the application in blue ink prior to the interview.

The red ink writing on DHR Exhibit 2, which appears in the blue sections of the form, reflects what Ms. Wilson wrote in response to Ms. Aboraia's verbal responses during the January 15, 2002, interview. The term "C/S" which appears in Ms. Wilson's notes is shorthand for "Client states."

During the interview, Ms. Wilson asked Ms. Aboraia to tell her why she was applying for food assistance. Ms. Aboraia's response to that question, which was recorded by Ms. Wilson on the bottom right of the first page of the form, was that she was, "reapplying because she has been ill, recently diagnosed with Multiple Sclerosis, MS, and going blind." Transcript at 45. Ms. Aboraia told Ms. Wilson that: (1) she had three minor children named Jessica, Jovonte, and Charles; (2) one of the children was

---

[2] DHR is not seeking recoupment of any food assistance overpayments Ms. Aboraia received in 2002 or a determination that any such overpayments are nondischargeable; however, Ms. Wilson's testimony is important background information.

6

from her marriage; (3) she had adopted the other two children; and (4) no child support had been awarded for her birth child because the parental rights of the father had been terminated.

Ms. Wilson had a discussion with Ms. Aboraia about her employment which is recorded on page 7 of the application entitled "Income From Work." She asked Ms. Aboraia to tell her where she worked, her job title, how many hours she worked per week, her hourly pay rate, and if she had other jobs. Ms. Aboraia told her that: (1) she was working for Blue Cross Blue Shield; (2) she had been working there for 3 years; (3) she worked forty hours a week; (4) she earned $9.18 an hour; (5) she was paid biweekly on Friday; and (6) she did not hold any other jobs.

Ms. Wilson also asked Ms. Aboraia if she was receiving any income other than from her employment at Blue Cross. That discussion is recorded on page 9 of the application entitled "Other Income (Such as Checks or Cash.)" On that page, the form separately lists particular kinds of "other income" which must be reported. Those are: "Pension or Retirement," "Railroad Retirement," "HUD Utility Assistance," "Income from Land Rental or Rental Property," "Child Support or Alimony," and "Money From Friends or Relatives." It also includes two additional blocks for the applicant to reveal "Other" income.

Blocks for checking either "Yes" or "No," are included next to each category to allow the applicant to identify whether a specific category of unearned income is or is not being received. The application also included blocks for the amounts and other particulars of any such unearned income being received.

Ms. Aboraia checked the "No" boxes adjacent to all categories and left the "other" blocks blank.

Ms. Wilson discussed each of the specifically listed categories of "other income" with Ms. Aboraia and asked her item-by-item whether she was receiving any of them. She also asked whether Ms. Aboraia was receiving income from any "other" source not named. Ms. Aboraia told Ms. Wilson that she was not receiving any income either from the specifically listed categories or any "other" source. Ms. Wilson said that she specifically asked Ms. Aboraia "Do you have any other income other than what is listed here." Transcript at 40. She recorded Ms. Aboraia's response in her notes on the application as "C/S/ none," meaning the "client stated none." Id.

There is additional interview information on page 11 of the application, entitled "Quarterly Reporting." That section is blue and is available for the interviewer to project a quarterly budget for the applicant. Ms. Wilson noted on that part of Ms. Aboraia's application that there would be "no unearned income budgeted." She reached that conclusion because, "clt (meaning "client") declares none of any type rec'd (meaning "received")." DHR Exhibit 2.

7

Ms. Wilson explained that when completing that section she specifically asked Ms. Aboraia whether or not she was receiving any "unearned income." In response, Ms. Aboraia reiterated that she was not receiving any income other than from her employment. Ms. Wilson had Ms. Aboraia sign that page specifically for the purpose of acknowledging that response even though no space for an applicant's signature was provided.

According to Ms. Wilson, DHR determined, based on the information from DHR Exhibit 2, that Ms. Aboraia and her family were eligible to receive food assistance for the calendar year 2002, and did began to receive it.

Ms. Wilson explained that DHR would review Ms. Aboraia's eligibility each calendar quarter. For that review, on March 13, 2002, Ms. Aboraia completed and submitted the form entitled "Department of Human Resources Family Assistance Division Quarterly Report Form Report for the Month of 02/2002." DHR Exhibit 5. Ms. Wilson personally processed that report.

Under the heading "Household Unearned Income," paragraph 2 on page 1 of the form directs the preparer to:

"List below anyone in your household who received any unearned income this month. This includes Social Security, SSI, Family Assistance, Unemployment Compensation, pensions or retirement benefits, Veteran's benefits, Child Support, money from friends or relatives, or other kinds of money or checks.

DHR Exhibit 5. Below that part, the form provides several lines for the applicant to: name the "Household Member Receiving This [Unearned] Income;" to answer "Where did this Money Come From;" to state the "Amount(s)," of any such unearned income received; and to put the "Date Received," of any such unearned income. Those lines are blank on Ms. Aboraia's form.

When Ms. Wilson reviewed Ms. Aboraia's information she used the "income eligibility verification system," or IEVS, a computerized system designed to search for and reveal other sources of income from which an applicant might be receiving food assistance. DHR workers were required to check that system whenever they processed a quarterly report. The IEVS report Ms. Wilson ran did not include any additional income for Ms. Aboraia.[3]

_____

[3] In her testimony in this proceeding, Ms. Camela Griffin, another DHR employee, explained that the IEVS system consulted by DHR provides information about income an applicant is receiving only from sources in the State of Alabama and does not reveal information about income from another state.

Case 08-00218-BGC    Doc 62    Filed 02/06/12    Entered 02/06/12 12:34:49    Desc Main
Document    Page 8 of 31

Based on the information provided by Ms. Aboraia on the quarterly report form, Ms. Wilson determined that Ms. Aboraia and her family were still eligible to receive food assistance. The calculations Ms. Wilson used to make that determination are found on an "error reduction worksheet' which appears in the record as the last page of DHR Exhibit 5. Ms. Wilson completed that worksheet on April 2, 2002. From that review Ms. Wilson determined that Ms. Aboraia and her family were entitled to receive food assistance based on the information Ms. Aboraia put on the application, and as a result of that determination, Ms. Aboraia and her family were provided food assistance for the next month.

## C. Mr. Kwakou Muata's Testimony about
## Ms. Aboraia's 2003 Food Assistance

Kwakou Muata worked in DHR's food assistance office for twenty years. He was a case manager in 2003.[4] His job was to determine if applicants were eligible to receive food assistance. Ms. Aboraia was one of his clients.

Ms. Aboraia submitted her 2003 food assistance application on December 30, 2002. Mr. Muata identified it as DHR Exhibit 6 in this proceeding and testified that he interviewed Ms. Aboraia on January 16, 2003.

In review of the evidence, the Court finds that the printed portion of DHR Exhibit 6 is identical to DHR Exhibit 2. Again on the page entitled "Other Income (Such as Checks or Cash)," Ms. Aboraia checked the boxes titled "No" adjacent to all of the listed categories of potential unearned income. She left blank the two items labeled "Other." She also left blank the blocks provided for supplying particulars with respect to all of the categories.

Mr. Muata did not say that he talked with Ms. Aboraia about the information she put on this "Other Income" page. Indeed, there are not any notations or comments in the blue part of that section. In total, Mr. Muata's testimony indicates that he took the information that Ms. Aboraia provided at face value, and that he did not specifically ask her about it. "My normal practice would be to – to be honest, a lot of times if they have checked – you know, if they haven't listed anything, you know, sometimes you go with it and just put zeroes." Transcript at 68.

In contrast, on page 11 of the application entitled "Quarterly Reporting," (the section that provides the interviewer a space to project a quarterly budget for the applicant), Mr. Muata wrote, "CS HH's only 'income' is job wages, and no one assists them financially[.]" DHR Exhibit 6. Mr. Muata interpreted his notes to mean, "Client states household's only income is job wages and no one assists them financially."

---

[4] DHR is not seeking recoupment of any food assistance overpayments that Ms. Aboraia may have received in 2003 or a determination that any such overpayments are nondischargeable; however, Mr. Muata's testimony is important background information.

Transcript at 69. He explained the genesis and meaning of that notation. He said, "Down at the bottom, though, I would always – after I have done that, I always ask clients is this the only income you have, you know, her job wages. And I was told that it is." Id.

On March 10, 2003, Ms. Aboraia completed and submitted her "Department of Human Resources Family Assistance Division Quarterly Report Form Report for the Month of 02/2003." DHR Exhibit 7. Mr. Muata identified this form as Ms. Aboraia's February 2003 quarterly report. It is identical to DHR Exhibit 5. The lines provided under paragraph 2 labeled "Household Unearned Income," contain zeroes.

Mr. Muata processed the form and prepared an error reduction worksheet based on it. He determined that Ms. Aboraia and her children were eligible to receive food assistance in 2003 based on the information she provided on that form and on DHR Exhibit 6.

### D. Ms. Camela Griffin's Testimony about
### Ms. Aboraia's 2003, 2004 and 2005 Food Assistance

Ms. Camela Griffin was employed in DHR's food assistance program in 2003, 2004, and part of 2005. Her job was to determine if applicants were eligible to receive food assistance.

### 1. 2003

Ms. Aboraia submitted the form "Department of Human Resources Family Assistance Division Quarterly Report Form Report for the Month of," to DHR on June 9, 2003. DHR Exhibit 23, Page 2. This form is identical to DHR Exhibits 5 and 7 except that a date is not printed after the word "of" on this one. Below paragraph 2, entitled "Household Unearned Income," on the line provided to name the "Household Member Receiving This [Unearned] Income," Ms. Aboraia put the word "self." However, the lines provided for indicating "Where did this Money Come From," and the "Amount(s)" of any such unearned income received, and the "Date Received" of any such unearned income, are blank. Ms. Aboraia reported her earned income on the form and attached pay stubs to verify those earnings.

Ms. Griffin reviewed the information supplied by Ms. Aboraia on the form. She said that there was nothing questionable about that information. And like Ms. Wilson, Ms. Griffin used computerized systems to verify Ms. Aboraia's information. Specifically, Ms. Griffin used the computerized systems named "ALEX, IEVS and FACETS" searching for any income other than wages that Ms. Aboraia may have been receiving. Transcript at 84.

As noted above, Ms. Griffin explained that the IEVS system provides information about income an applicant is receiving from sources in the State of Alabama only and

does not reveal information about income being received by an applicant from another state. She did not say, nor was she asked, whether the ALEX and FACETS systems were also limited.

Finding no "other income," on June 17, 2003, Ms. Griffin prepared an error reduction worksheet based on the information Ms. Aboraia provided and determined that Ms. Aboraia and her family remained eligible to receive food assistance. See DHR Exhibit 23, Page 1. Based on Ms. Griffin's determination, Ms. Aboraia and her children continued to receive food assistance.

## 2. 2004

Ms. Aboraia submitted a food assistance "recertification" application to DHR on January 26, 2004. Ms. Griffin identified that application as DHR Exhibit 8 and the one submitted by Ms. Aboraia for the calendar year 2004. This form is different from those Ms. Aboraia used in previous years to apply for food assistance. It is a shorter form used by applicants who were already receiving food assistance.[5]

Ms. Griffin discussed this application with Ms. Aboraia over the telephone on January 29, 2004. Ms. Griffin's handwritten notes of that telephone interview appear on DHR Exhibit 8 primarily in red ink except for a part on page 1 of the section entitled "Record of Contact," which is the next to the last page of that exhibit.

The following is printed in the upper left hand corner of page 4 of DHR Exhibit 8:

Unearned income includes checks, or cash, or money deposited into a bank account. Examples: Social Security, SSI, family assistance, VA, child support or alimony, worker's comp, military allotment, unemployment compensation, pension income, retirement income, interest and dividends, Railroad retirement, money or contributions, rent from land or property, grants, loans, scholarships and any other income not listed as wages in the next section.

DHR Exhibit 8, Page 4.

Like the prior forms, this form provides blocks for the applicant to list the "Kind of Unearned Income," if any, the "Gross Amount" of any said income, and how often that income is being received. Ms. Aboraia wrote "N/A" across the middle of those blocks.

---

[5] DHR is not seeking recovery from Ms. Aboraia of any overpayments she received before January 2004, and it does not contend that she owes a nondischargeable obligation to repay any overpayments that she received before January 2004. Like the testimonies of Ms. Wilson and Mr. Muata, the testimony of Ms. Griffin about matters that occurred in 2003 and 2004, while not within the target time period, is important background.

11

Ms. Griffin specifically asked Ms. Aboraia whether or not she was receiving any "unearned income."  Ms. Aboraia told Ms. Griffin that she was not receiving any "unearned income."  Ms. Griffin recorded that response on page 4 of the application in red ink as "CS - no unearned income."  DHR Exhibit 8.  "CS" is shorthand for "Client states."

After that interview, Ms. Griffin made the determination that Ms. Aboraia and her children were eligible to continue to receive food assistance.  And based on that determination, Ms. Aboraia and her children were approved by DHR to receive food assistance during the calendar year 2004.

DHR Exhibit 9 is the quarterly report form Ms. Aboraia submitted for the first quarter of 2004.  The form is essentially identical to the other quarterly reports Ms. Aboraia submitted to DHR and which are also in evidence. Again, Ms. Aboraia left the lines blank under paragraphs which relate to "Household Unearned Income."

At Ms. Aboraia's request, Ms. Griffin completed the top part of this form, which contains the food assistance case number, the applicable dates, and Ms. Aboraia's name, address and telephone numbers. That was done prior to Ms. Griffin sending the report to Ms. Aboraia.

Ms. Griffin testified about a telephone conversation she had with Ms. Aboraia on March 17, 2004.  She said that Ms. Aboraia told her that she had written and submitted all of the other information on DHR Exhibit 9.

DHR Exhibit 11 is the quarterly report form Ms. Aboraia submitted for the second quarter of 2004.  The form is essentially identical to the other quarterly reports Ms. Aboraia submitted and which are in evidence. Again, Ms. Aboraia left the lines blank under paragraph 2 regarding "Household Unearned Income."

DHR Exhibit 12 is the quarterly report form Ms. Aboraia submitted for the third quarter of 2004.  Again, at Ms. Aboraia's request, Ms. Griffin completed the top part of the form, which contains the food assistance case number, the applicable dates, and Ms. Aboraia's name and address, before sending the form to Ms. Aboraia.  A handwritten note on the form by Ms. Griffin next to that information indicates that the reason Ms. Aboraia asked her to write that information on the form before sending it to her was "due to her disability."  DHR Exhibit 12.  Ms. Griffin stated that Ms. Aboraia asked her to write that information "kind of big so that she could see it...."  Transcript at 102.  Ms. Griffin acknowledged that Ms. Aboraia had informed her at some point in their numerous conversations that she was blind.

DHR Exhibit 12 is different than the other quarterly reports Ms. Aboraia submitted, although it asks for essentially the same information.  At the bottom of the first page, in the last paragraph (which is unnumbered), the form reads:

Report all income other than income from work.  List all checks or money currently received by you or any other household member.  Examples: family assistance, Social Security, SSI, VA, unemployment benefits, worker's comp, child support, military allotments, contributions from friends or relatives, pensions, or other income or money.

DHR Exhibit 12.

In spaces below this paragraph the applicant is asked to provide details of any such "income other than income from work" being received including the name of the person receiving the income, the amount of such income, the source of such income, and the frequency with which such income was being received.  Ms. Aboraia left those spaces blank.

Ms. Griffin did not testify that she interviewed Ms. Aboraia in regard to DHR Exhibit 12.  Moreover, she could not recall whether she approved Ms. Aboraia's family's continued receipt of food assistance based on that report. The Court presumes she did as Ms. Aboraia and her family continued to receive food assistance.

### 3.  2005

DHR Exhibit 13 is the food assistance "recertification" application Ms. Aboraia submitted on December 9, 2004, for the calendar year 2005.  The application is identical in form to DHR Exhibit 8.  Ms. Aboraia placed "N/A" in large block letters in the space on page 4 provided for itemizing details regarding "unearned income."

Ms. Griffin interviewed Ms. Aboraia about the application on December 20, 2004, by telephone.  In that interview, she asked Ms. Aboraia whether she was receiving any "unearned income" and whether she was receiving any of the categories of "unearned income" specifically listed on the form.  Ms. Aboraia responded that she was not receiving any "unearned income."  Ms. Griffin recorded that response on page 4 of the application in blue ink as "CS none," meaning "Client states none."  Based on the information on DHR Exhibit 13, Ms. Aboraia and her children were approved to receive food assistance in 2005.

### E.  Ms. LaNetra J. Belser's Testimony about Ms. Aboraia's 2005 Food Assistance

Ms. Belser was a financial support worker with DHR's food assistance program in June 2005.  Her job was to determine if applicants were eligible to receive food assistance.  She identified DHR Exhibit 14 as the six-month report Ms. Aboraia submitted in June 2005.  As with Ms. Griffin, Ms. Aboraia asked Ms. Belser to complete the portion of the form seeking her name, address, and case number before sending it.  Ms. Belser did that and sent the form to Ms. Aboraia, who completed it and returned it to Ms. Belser.

13

DHR Exhibit 14 is identical in form to DHR Exhibit 12. As such, at the bottom of the first page, in the last paragraph (which is unnumbered), the form contains the same language as DHR Exhibit 12 regarding "income other than income from work." Once again, Ms. Aboraia left that part blank.

After reviewing the form, Ms. Belser averaged Ms. Aboraia's income, updated it in the system, and filed the form in her case record. Based on that review, Ms. Belser determined that Ms. Aboraia and her children remained eligible for, and would continue to receive food assistance.

In contrast to prior years, Ms. Aboraia's food assistance allotment decreased because DHR believed her income increased. A notice of action was mailed to Ms. Aboraia. That notice reflected the reduction in benefits and detailed the purported income increase that caused the reduction.

In response, on August 1, 2005, Ms. Aboraia contacted Ms. Belser to tell her that the income figures used to make the eligibility determination in relation to the June 2005 six-month report were inaccurate. Ms. Belser made a record of that conversation which is contained in the handwritten notes in a document entitled "Record of Contact" admitted in this proceeding as DHR Exhibit 15. The notes reflect that Ms. Aboraia told Ms. Belser that although her pay rate had not changed, her hours at work had been reduced because of her multiple sclerosis. Ms. Aboraia asked Ms. Belser to recalculate the income to reflect that Ms. Aboraia was not earning the amount DHR used to calculate her benefits.

Ms. Belser learned later from an anonymous report that in addition to the food assistance Ms. Aboraia was receiving from the State of Alabama, Ms. Aboraia was receiving $800 a month in assistance from DCFS. Ms. Belser confronted Ms. Aboraia with that information. Her notes of the conversation she had with Ms. Aboraia appear on the "Record of Contact" admitted into evidence as DHR Exhibit 16. In response to questions posed by Ms. Belser, Ms. Aboraia told her that the money she was receiving from DCFS represented subsidy payments for the two children she had adopted in September 1999, and that she had been receiving those subsidy payments since September 9, 1999.

Ms. Belser told Ms. Aboraia of the requirement to report those subsidy payments on her food assistance applications, and that the failure to do so was "fraudulent." In response, Ms. Aboraia told Ms. Belser that the subsidy she was receiving for one of the children was about to end because the child would turn 18 in March 2006. But, according to Ms. Belser, Ms. Aboraia did not assert that the subsidies were not "income," or were not supposed to be reported as income. Ms. Belser admitted, however, that she did not specifically ask Ms. Aboraia to explain why she had not reported the subsidies. Ms. Belser then asked Ms. Aboraia if she could produce any "stubs" or written documentation which reflected or evinced her receipt of those subsidies. Ms. Aboraia replied that she had no such documentation.

14

Ms. Belser prepared DHR Exhibit 18 after that conversation. She named it "Request for Additional Information" and mailed it to Ms. Aboraia. That document informed Ms. Aboraia that DHR had received notification that: (1) she was receiving what it considered "income" from "the DHR in Chicago" for her adopted children; (2) she had acknowledged receiving that so-called "income" in her telephone conversation with Ms. Belser; and (3) DHR requested written verification of receipt of that income.

Ms. Aboraia did not respond to that request, and Ms. Belser closed Ms. Aboraia's case for failure to provide the requested verification. On February 14, 2006, Ms. Belser prepared and submitted DHR Exhibit 22, entitled "Identification and Possible Claims Form." The Court presumes that form is used to report claimants who have received food assistance over payments and is the starting point of the process of taking action to recover those overpayments.

Ms. Aboraia received her last DHR payment in December 2005.

### F. Thomas G. Stuart's Testimony: Calculation of Ms. Aboraia's Debt

Mr. Thomas G. Stuart is the supervisor of DHR's Birmingham Regional Claim Center. That center processes food assistance overpayments. The officials in that office review records to insure that possible overpayment cases referred to them are valid. If they determine that one is, they will calculate the amount of the overpayment.

Through this process, Mr. Stuart determined that Ms. Aboraia received $7,440 more in benefits from January 2004 through December 2005 from the DHR than she should have received. Thus, he concluded Ms. Aboraia received an overpayment. Mr. Stuart calculated that during that time period Ms. Aboraia and her children received $8,631 in food assistance from DHR. From that amount he subtracted $1,191, the amount they would have been entitled to had Ms. Aboraia reported the DCFS subsidies.

According to Mr. Stuart's testimony, of the $7,440 food assistance DHR contends Ms. Aboraia was not entitled to receive, $6,670 was paid to her prior to the October 15, 2005, conversion of her case with a significant part of that amount being paid after the case was filed. The remaining $770 was paid to her after October 15, 2005. She received her last food assistance payment from DHR in December 2005.

Mr. Stuart's calculations are contained in DHR Exhibit 20, entitled "Overpayment Report." His office prepared that report on June 21, 2006, he approved it, and it represents his office's final determination and verification that DHR indeed held an overpayment claim against Ms. Aboraia.

On October 29, 2007, DHR asked Ms. Aboraia to begin making monthly payments on the claim. See Plaintiff's Exhibit 1. DHR Exhibit 21 reflects that Ms.

Aboraia payed for a while. When she stopped, without Ms. Aboraia's consent, DHR made monthly deductions from her social security disability check.

Mr. Stuart's records show that Ms. Aboraia repaid $2,414.19 of the overpayment debt leaving a current overpayment balance of $5,025.10.

## V. Conclusions of Law

DHR contends that Ms. Aboraia's debt is not dischargeable. It makes three arguments. Those are: (1) Ms. Aboraia committed the fraud described in section 523(a)(2)(A); (2) Ms. Aboraia committed the fraud described in section 523(a)(2)(B); and (3) the debt is a domestic support obligation under section 523(a)(5) and is therefore not dischargeable.

Each of those arguments is discussed below; however, before addressing them, the Court must first consider this threshold question: Is Ms. Aboraia's debt to DHR even eligible for discharge?

## A. Is Ms. Aboraia's Debt
## Even Eligible for Discharge?

This issue arises because of the operation of two general rules.

### 1. The First General Rule

The first general rule is that debts that are neither listed nor scheduled in bankruptcy are not eligible for discharge. See 11 U.S.C. § 523(a)(3). In this case, the evidence is clear, and Ms. Aboraia admits, that she did not list her food assistance overpayments in either the schedules she filed with her original Chapter 13 petition or the documents she filed in the converted case. There is, however, an exception to this rule which, if it applies, allows a debtor to reopen a case and capture unlisted debts.

The general rule comes from section 523(a)(3) of the Bankruptcy Code which reads:

> (a)    A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt –
>
> .....
>
> (3)    neither listed nor scheduled under section 521(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit–

16

(A)     if such debt is not of a kind specified in
        paragraph (2), (4), or (6) of this subsection,
        timely filing of a proof of claim, unless such
        creditor had notice or actual knowledge of the
        case in time for such timely filing;  or

(B)     if such debt is of a kind specified in paragraph (2), (4),
        or (6) of this subsection, timely filing of a proof of
        claim and timely request for a determination of
        dischargeability of such debt under one of such
        paragraphs, unless such creditor had notice or actual
        knowledge of the case in time for such timely filing
        and request ....

11 U.S.C. § 523(a)(3).

Clearly, under this rule unless Ms. Aboraia's conduct is excepted her DHR debt would not be eligible for discharge. What then is the exception?

The exception is this, under section 350(b) of the Bankruptcy Code, "A case may be reopened in the court in which the case was closed to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b).  The test in this Circuit for determining whether a particular case may be reopened, and particularly whether it may be reopened to schedule debts not originally listed, is the test established by the Court of Appeals for the Eleventh Circuit in Samuel v. Baitcher (In re Baitcher), 781 F.2d 1529 (11th Cir. 1986).  In Baitcher the Court held that a debtor may reopen his or her no-asset case and obtain the post facto, nunc pro tunc discharge of a debt which he or she had not originally scheduled in his or her petition despite the prohibition of section 523(a)(3) if the debtor, "failed to schedule for reasons of honest mistake, not 'fraud or intentional design.'" 781 F.2d at 1534.  The question then is whether the evidence here satisfies that test.

The evidence submitted by both Ms. Aboraia and DHR, demonstrates that Ms. Aboraia did not know about her DHR debt prior to March 29, 2006, the date her case was closed, or a fortiori prior to February 1, 2006, the date her discharge was granted, or a fortiori, prior to January 27, 2006, the deadline set in her Chapter 7 case for filing complaints to determine the dischargeability of debts.

When Ms. Belser spoke with Ms. Aboraia on November 18, 2005, about the subsidies Ms. Aboraia was receiving from DCFS, Ms. Belser did not, according to her testimony, tell Ms. Aboraia that there was an overpayment of food assistance or, more importantly, that Ms. Aboraia would have to pay anything back to DHR.  In fact, Ms. Belser could not have said anything of the sort to Ms. Aboraia since those determinations had not been made and were not part of her job to make.  All Ms. Belser was authorized to do was:

17

(1) to obtain additional information from Ms. Aboraia about the subsidies, which she sought to do through DHR Exhibit 18, dated November 18, 2005 (an exhibit that does not contain any reference of any sort to either overpayments or repayment); and

(2) to refer the matter to Mr. Stuart's department, which she did through DHR Exhibit 22 on February 14, 2006, (a date after the deadline for DHR to file a complaint to determine dischargeability had passed and after Ms. Aboraia's discharge had been granted), which is why DHR Exhibit 22 makes reference to a "possible claim."[6]

After Ms. Belser acted, it was then up to Mr. Stuart's department, according to his testimony, to make the final determinations of: (1) whether Ms. Aboraia had received an overpayment, and (2) whether DHR then had a claim against her for repayment of that overpayment.

The evidence shows that the latter determination was not made until June 21, 2006, three months after Ms. Aboraia's bankruptcy was closed and, of course, well after the bar date for filing a complaint to determine the dischargeability of that claim. In fact, it was not until months after that date, that is, on or around October 29, 2007, (by virtue of the conversation referred to in Plaintiff's Exhibit 1), that Ms. Aboraia was first notified and became aware that she owed a debt to DHR as a result of the overpaid food assistance. As such, she did not become aware of the DHR claim until after her bankruptcy case had been closed. Therefore, she could not possibly have listed the DHR debt in her bankruptcy case. Consequently, her failure to schedule that debt was necessarily not the result of fraud or intentional design and section 523(a)(3) cannot preclude her DHR debt from being eliminated by the discharge granted Ms. Aboraia on February 1, 2006.

Based on the above, the Court finds that the general rule under section 523(a)(3) that debts not listed or scheduled in bankruptcy are not eligible for discharge does not apply here. In contrast, the exception to that rule by way of section 350(b) and Samuel v. Baitcher (In re Baitcher), 781 F.2d 1529 (11th Cir. 1986) does apply. Consequently, this case may be reopened to capture the unlisted DHR debt, and as to this part of the threshold issue, the answer is Ms. Aboraia's debt is eligible for discharge.[7] Application of the second general rule may, however, limit that eligibility.

---

[6] Of course, Ms. Aboraia was not sent a copy of that document, was not meant to receive a copy of it, and was not otherwise notified. She did not even have any knowledge that her situation had been referred as a "possible claim."

[7]The Court does not find that this case must be technically reopened to accomplish this result.

## 2. The Second General Rule

The second general rule is that only debts that arose prior to the filing of the bankruptcy petition are eligible for discharge. See 11 U.S.C. § 727(b). The evidence on this point is also clear, and Ms. Aboraia also admits, that part of her debt to DHR occurred after she filed her case. So, if this rule applies, part of Ms. Aboraia's debt may not be eligible for discharge. But, like the first rule, there is an exception to this rule. The exception arises where a case is converted from Chapter 13 to Chapter 7, the situation in the present case.

The general rule comes from Section 727 of the Bankruptcy Code. That section provides, "a discharge under subsection (a) of this section discharges the debtor from all debts that arose <u>before the date of the order for relief</u> under this chapter...." 11 U.S.C.. § 727(b) (emphasis added). For purposes of this general rule, the "filing date" and the "date for the order for relief" are synonymous. This point is very important as will be obvious later.[8]

The exception to the second general rule comes from section 348 of the Bankruptcy Code. The exception is that the date of the entry of the order for relief changes when a case is converted from Chapter 13 to Chapter 7. This is important as the general rule's prohibition of discharging debts is tied directly to the timing of the order for relief. That is the circumstance here.

The question then is whether Ms. Aboraia's discharge eligibility is limited by the general rule or confirmed by the exception.

As discussed above, according to Mr. Stuart, the total amount Ms. Aboraia received from DHR was $8,631. Of that amount, Ms. Aboraia was entitled to receive only $1,191. The difference, and the amount of food assistance DHR contends Ms. Aboraia was not entitled to receive is $7,440. Of that amount, the evidence shows that $6,670 was paid to Ms. Aboraia prior to conversion of the case on October 15, 2005, with a significant part of that amount being paid after the case was filed. In contrast, the remaining $770 ($7,440 less $6,670) was paid to her after October 15, 2005, the conversion date.

Finally, according to Mr. Stuart's testimony Ms. Aboraia repaid $2,414 of the $7,440 overpayment she received. Therefore, the amount she still owes DHR is $5,026.

---

[8] Because "orders for relief" are almost always entered immediately upon the filing of bankruptcy petitions, as was the one in this case, under the general rule, debts that arose prior to the <u>filing</u> and debts that arose prior to the entry of the <u>order for relief</u> are one and the same.

What part then, if any, of Ms. Aboraia's debt remains eligible for discharge?

A discharge in a Chapter 7 bankruptcy case is authorized by section 727. 11 U.S.C. § 727. Subsection (b) of that section identifies which debts qualify for that discharge in relation to the time the "order for relief" was entered. Section 727(b) includes, "Except as provided in section 523 of this title, a discharge under subsection (a) of this section discharges the debtor from all debts that arose **before** the date of the **order for relief** under this chapter...." 11 U.S.C. § 727(b) (emphasis added).[9]

In a non-conversion situation, the date of the order for relief is usually the date the case was filed. In contrast, that time is different in a converted case. Section 348, appropriately titled, "Effect of Conversion," explains the difference. Subsection 348(a) provides:

> Conversion of a case from a case under one chapter of this title to a case under another chapter of this title constitutes an order for relief under the chapter to which the case is converted, but, **except as provided in subsections (b)** and (c) of this section, does not effect a change in the date of the filing of the petition, the commencement of the case, or the order for relief.

11 U.S.C. § 348(a).

The "**except as provided in subsections (b)**" language referred to in subsection 348(a) reads:

> Unless the court for cause orders otherwise, in section... 727(b)... of this title, "the order for relief under this chapter" in a chapter to which a case **has been converted** under section 706, 1112, 1208, or 1307 of this title **means the conversion** of such case to such chapter.

11 U.S.C. § 348(b).[10]

Ms. Aboraia filed her Chapter 13 bankruptcy case on June 4, 2004. Consequently, the order for relief in that case was entered on June 4, 2004. However, under operation of the sections discussed above, when Ms. Aboraia converted her Chapter 13 case to Chapter 7 on October 15, 2005, the date of her order for relief was changed to October 15, 2005.

---

[9] The "Except as provided in section 523" modifier will become important to this discussion shortly.

[10] The Court has not ordered otherwise.

Case 08-00218-BGC   Doc 62   Filed 02/06/12   Entered 02/06/12 12:34:49   Desc Main
Document   Page 20 of 31

As explained above, according to DHR Exhibit 20 and Mr. Stuart's testimony, $6,670 of the $7,440 food assistance DHR contends Ms. Aboraia was not entitled to receive was paid to her prior to October 15, 2005, the date her case was converted to Chapter 7. When section 348(b) changed the date for the order for relief from the day the case was filed to the later date of conversion, even though the assistance may have been paid after the original date of the order for relief, $6,670 is captured now because it was, according to DHR, paid before conversion.[11] As such, of the $7,440 DHR contends Ms. Aboraia should not have received, at least $6,670 remains eligible for discharge.

Further analysis confirms this conclusion. Section 348(d) of the Bankruptcy Code provides:

> A claim against the estate or the debtor that arises <u>after</u> the order for relief but before conversion in a case that is converted under section 1112, 1208, or 1307 of this title, other than a claim specified in section 503(b) of this title, shall be treated for all purposes as if such claim had arisen immediately before the date of the filing of the petition.

11 U.S.C. § 348(d)(emphasis added).[12]

Based on the evidence, the Court finds this part of Ms. Aboraia's DHR debt is eligible for discharge. The interaction of Bankruptcy Code sections 727(b), 348(b), and 348(d) make the pre-conversion part eligible.[13] Those sections explain why this amount is captured by the debtor's February 1, 2006, discharge even though the assistance creating the debt was provided after this case was filed and after the "original" order for relief was entered. This result is caused by the impact of conversion on the timing of the order for relief. Therefore, the pre-conversion amount of $6,670, that is, the amount Ms. Aboraia received before she converted her case to Chapter 7 on October 15, 2005, remains eligible for discharge.

In contrast, for the same reasons, because $770 was paid to Ms. Aboraia after her case was converted, it is not eligible for discharge.

---

[11] Whether some of the $6,670 was paid to Ms. Aboraia before she filed her Chapter 13 case, and therefore eligible for discharge as a prepetition debt, is irrelevant. All of the $6,670 is, at this point, pre-conversion and eligible for capture by the debtor's discharge.

[12] This is not a section 503(b) claim, and the case was converted under one of the listed sections.

[13] This type of analysis is one of those great examples of what prompted the late Honorable Clifford Fulford, United States Bankruptcy Judge for the Northern District of Alabama, to describe the Bankruptcy Code as a five-finger code. He coined that phrase because sometimes it took five fingers to hold one's places in a printed code.

21

### 3. Summary of the Impact of the Two General Rules

In summary, as to the threshold question of whether Ms. Aboraia's DHR debt is even eligible for discharge, the Court finds that of the $7,440 DHR contends is not dischargeable, the $6,670 paid pre-conversion is eligible, but the post-conversion amount of $770 is not.

### B. DHR's Three Arguments for Nondischargeability

While $6,670 of Ms. Aboraia's may be <u>eligible</u> for discharge, that does not make it so. As stated above, DHR makes three arguments why none of the debt should be discharged. Those arguments are discussed below.

### 1. DHR's First and Second Arguments - Ms. Aboraia's Debt Was Obtained By Fraud and is Nondischargeable Under Sections 523(a)(2)(A) and Section 523(a)(2)(B)

DHR's first two arguments are that the $7,440 Ms. Aboraia should have not received in 2004 and 2005 food assistance payments is nondischargeable under either section 523(a)(2)(A) or section 523(a)(2)(B) of the Bankruptcy Code.[14]

---

[14] Due process, Section 523(c)(1) of the Bankruptcy Code, and Federal Rule of Bankruptcy Procedure 4007, of course, require that DHR be given the opportunity to file a compliant for a determination that its debt is nondischargeable by virtue of either section 523(a)(2), section 523(a)(4), or section 523(a)(6) of the Bankruptcy Code.

DHR has taken that opportunity in the form of the several counterclaims which it has filed in this adversary proceeding. Those counterclaims, according to F.R.Civ.P. 13, technically represent amendments to DHR's original answer, but were filed after the time allowed for amending that pleading as a matter of right pursuant to F.R.Civ.P. 15(a). Counterclaims filed after that period must ordinarily be accompanied by either a motion for leave to amend or consent of the opposing party, and are legal nullities if the proposed amendment is not accompanied by either the requisite motion or consent. <u>Hoover v. Blue Cross and Blue Shield of Alabama</u>, 855 F.2d 1538, 1544 (11th Cir. 1988).

In this case, however, that result is not warranted because a deadline for filing nondischargeability complaints by DHR has not been established. Consequently, if its counterclaims, which have nothing really to do with the 523(a)(3)/<u>Baitcher</u> issues raised in Ms. Aboraia's complaint, are not considered in this adversary proceeding, DHR would presumably be free to resubmit them as free standing and independent proceedings which it would have to prove, and try, and the debtor would have to defend, all over again, which is a prospect that neither party would ostensibly relish. In that event, judicial resources will have been wasted as well as the time, expense, and effort which has been expended by both parties in litigating the issues raised by those counterclaims. Moreover, the plaintiff has not objected to the legal

DHR is proceeding under section 523(a)(2)(A) with respect to things said or not said by Ms. Aboraia in the conversations she had with its representatives.  It is proceeding under section 523(a)(2)(B) with respect to the documents submitted by Ms. Aboraia. These arguments are discussed together as the evidence for both is the same.

### a.  Applicable Law

Section 523(a)(2)(A) makes nondischargeable debts for, "money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, <u>other than a statement respecting the debtor's or an insider's financial condition</u>...."  11 U.S.C. § 523(a)(2)(A) (emphasis added).

Section 523(a)(2)(B) makes nondischargeable:

> any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by.... use of a statement in writing (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied;  and (iv) that the debtor caused to be made or published with intent to deceive....

11 U.S.C. § 523(a)(2)(B).[15]

---

validity of those counterclaims and has otherwise not suggested that any of them are null or should not be considered, but instead has fully defended against the same both at trial and prior thereto.  Therefore, in keeping with the overall liberal amendment policy of rule 15(a) and the general desirability of minimizing needless formalities, the Court will, under the present circumstances, permit the amendments made by DHR to its original answer without the necessity of formal application.  <u>Hoover v. Blue Cross and Blue Shield of Alabama</u>, 855 F.2d at 1544.  Ms. Aboraia is, in turn, not required to file replies to those counterclaims pursuant to F.R.Civ.P. 7(a) since she has made it abundantly clear what her replies to the same are and DHR has otherwise not insisted that any such replies be made.

[15] These definitions create two distinct exceptions to discharge. Expressly excluded from the operation of Section 523(a)(2)(A) are statements respecting a debtor's financial condition. Section 523(a)(2)(B) expressly relates only to written statements respecting a debtor's financial condition.  Consequently, a false <u>oral</u> statement made by a debtor about his financial condition cannot create or result in a debt which is not dischargeable under either section.  And a false <u>written</u> statement which is not about the debtor's or an insider's financial condition cannot create or result in a debt which is nondischargeable under section 523(a)(2)(B).  Therefore, the two subsections are mutually exclusive.  <u>First Nat. Bank of Olathe, Kan. v. Pontow</u>, 111 F.3d 604, 608 (8th Cir. 1997).

For a misrepresentation to constitute fraud for purposes of establishing the nondischargeability of an obligation pursuant to either section 523(a)(2)(A) or section 523(a)(2)(B), it must have been fraudulently made. That means, the debtor must have either known that the representation was false when he or she uttered it or uttered it, "with reckless indifference to the actual facts, without examining the available source of knowledge which lay at hand, and with no reasonable ground to believe that it was in fact correct." Morimura, Arai & Co. v. Taback, 279 U.S. 24, 34 (1929)(523(a)(2)(B)'s precursor under the Bankruptcy Act). See also HSSM # 7 Limited Partnership v. Bilzerian (In re Bilzerian), 100 F.3d 886, 892 (11th Cir. 1996)(523(a)(2)(A)); Shelby v. Texas Imp. Loan Co., 280 F.2d 349, 355 (5th Cir. 1960)(523(a)(2)(B)'s precursor).[16]

### b. Application of the Law to the Facts

#### (1) Ms. Aboraia Did Not Believe
#### that the Illinois Assistance Was Income

Ms. Aboraia testified that she did not believe that the adoptive parent subsidies she was receiving from Illinois Department of Children and Family Services (DCFS) constituted "income" for any purpose. She based that belief on exactly what DCFS told her, a basis that was confirmed in the April 24, 2009, letter Mr. Corey Wiegand, the Administrator of the Central Payment Unit of DCFS, sent to Ms. Aboraia's bankruptcy attorney. That letter stated the agency's position which was – the assistance it provided to Ms. Aboraia over the years for the care of her foster children, and later her adopted children, "under no circumstances" constituted "income." As such, that letter, sent by the officials actually making the payments to Ms. Aboraia, implicitly corroborates Ms. Aboraia's testimony that the position taken by Mr. Wiegand in the letter had been communicated to her by DCFS. And because of it, Ms. Aboraia had ample reason to believe that the assistance she was receiving from Illinois was not to be considered income for any purpose, including for purposes of making application for food assistance in Alabama.

#### (2) DHR's Applications and Forms

None of the applications or other documents Ms. Aboraia completed for DHR contain any language which would have led her to question her reasonably founded belief that the subsidies she was receiving from DCFS were income of any sort, whether earned or unearned, and in Mr. Wiegand's words, "under any circumstances." Similarly, none of those documents specifically mention adoptive parent subsidies or ask an applicant to divulge adoptive parent subsidies. The forms' general categories such as "unearned income," or "other income," or "other kinds of money or checks," or "Family Assistance," would have been insufficient to dissuade Ms. Aboraia from

---

[16]  The cases which support this proposition are legion. Compiling and cataloging them here would serve no purpose.

24

believing that the adoptive parent subsidies that she was receiving from DCFS were not "income" under any circumstances. DCFS specifically instructed her that those subsidies were not. And since those adoptive parent subsidies were not, according to DCFS's instructions, "income," then Ms. Aboraia naturally and reasonably believed that they could not possibly be, or could not constitute, "unearned income," or "other income," or income of any sort whether earned or unearned.

Moreover, the forms Ms. Aboraia completed listed specific types of assistance that were required to be divulged by food assistance applicants, such as "pension or retirement," "railroad retirement," "HUD utility assistance," "income from land rental or rental property," "child support or alimony," and "money from friends or relatives," "Social Security," "SSI," "family assistance," "unemployment compensation," and "veteran's benefits." Those forms did not list either foster care or adoptive parent subsidies. As such, the forms were more likely to have confirmed Ms. Aboraia's confidence in what she had been told by DCFS than dissuade her.

And finally, each of the specifically enumerated types of payments on DHR's food assistance forms were categorized and defined as "unearned income" or "other income." Because Ms. Aboraia had reason to believe that adoptive parent subsidies were not "income," it was natural for her not to list them under either of those categories, and it was reasonable for her to believe that if DHR disagreed with DCFS and intended for them to be "income," it would have said so on its forms.

### (3) DHR's Representatives' Communications with Ms. Aboraia

According to their testimonies, nothing that DHR's representatives said to Ms. Aboraia would have served directly to contradict what Ms. Aboraia had been instructed by DCFS about adoptive parent subsidies not being income under any circumstances.

With respect to the documents signed and submitted by Ms. Aboraia to DHR, there is no evidence that any of that agency's representatives had any conversation with Ms. Aboraia about DHR Exhibits 5, 7, 11, 12, or 23.

Ms. Griffin said that she interviewed Ms. Aboraia about DHR Exhibit 9 but did not say that the subject of "income" was broached in that conversation.

Ms. Wilson testified that when she interviewed Ms. Aboraia about DHR Exhibit 2, she asked Ms. Aboraia generically if she was receiving any income that she had not listed on the form. She also specifically reiterated each of the categories or types of income listed on pages 8 and 9 of the form and asked Ms. Aboraia if she was receiving any of those types of "income."

Mr. Muata's only question to Ms. Aboraia, with respect to DHR Exhibit 6, was whether Ms. Aboraia was receiving any income other than the wages from her job.

25

Likewise, with respect to DHR Exhibit 8, Ms. Griffin merely asked Ms. Aboraia if she was receiving any "unearned income" without otherwise elaborating on or explaining that term. In addition, with respect to DHR Exhibit 13, Ms. Griffin asked Ms. Aboraia generically whether she was receiving "unearned income" and whether she was receiving any of the types of "unearned income" specifically listed on the form.

None of DHR's representatives who spoke to Ms. Aboraia at any point specifically told her that any state or federal monetary assistance she may have been receiving for the care of her adopted children constituted "unearned income" for purposes of food assistance.[17] In fact, none of DHR's representatives who spoke to her ever even mentioned adoptive parent subsidies or asked her whether or not she was receiving any such subsidies. Consequently, they imparted nothing to Ms. Aboraia that would or should have led her to disbelieve what DCFS had told her.

Moreover, the generic references by Ms. Wilson, Mr. Muata, and Ms. Griffin to "other income" and "unearned income" could not possibly have served to dissuade Ms. Aboraia of her reasonably obtained belief that adoptive parent subsidies did not constitute "income" of any sort under any circumstances, including for purposes of making application for food assistance. In her mind, and reasonably so, for something to have been either "unearned income" or "other income," it would have had to have been "income" in the first place. That of course would have excluded adoptive parent subsidies because those things were not, according to the DCFS, "income."

In contrast, when Ms. Wilson and Ms. Griffin mentioned each of the distinct types of non-wage "income" listed on DHR Exhibit 2 and DHR Exhibit 13, they must have reinforced Ms. Aboraia's reasonably founded belief that adoptive parent subsidies were not "income" under any circumstances. It was therefore reasonable for Ms. Aboraia to have assumed that if DCFS had incorrectly instructed her that adoptive parent subsidies were not "income" under any circumstances, then Ms. Wilson or Ms. Griffin would have certainly asked her specifically if she was receiving adoptive parent subsidies since they had asked her specifically about a litany of other types of "other income" and/or "unearned income."

### (4) DHR's "Should Have Known" Argument

On a finer point, DHR appears to argue that even though DCFS instructed Ms. Aboraia that adoptive parent subsidies could not possibly constitute income under any circumstances, she should have known to list those subsidies on her food assistance applications because it should somehow be obvious to everyone that in common

---

[17] Of course, when the Court writes, "None of DHR's representatives who spoke to Ms. Aboraia...," it cannot know for certain that there were not other DHR representatives who spoke to Ms. Aboraia. In that context, the Court's statement refers only to those DHR representatives who testified at trial.

parlance "unearned income" includes anything other than one's wages. The Court cannot accept that "should have known" is actually known. Nor does the Court accept that such knowledge would rise to the level of recklessness if the debtor in question actually believed the representation was true and had reasonable grounds for believing that it was true.

Why would Ms. Aboraia believe anything to the contrary? She had been specifically instructed by people in a position to know, i.e., DCFS, that adoptive parent subsidies are not "income." She logically deduced that since those subsidies could not be "income," whether earned or unearned, they could not be "unearned income," which, by definition, must be "income" to begin with. She then based her decision not to list those subsidies on DHR's forms, and not to disclose them to DHR's representatives in response to their questions about "unearned income," on the instructions she received from DCFS. She did not base them on any unfounded assumptions others, who had not received those instructions, "should" have made.

The Court cannot accept DHR's conclusion. Why would a reasonable person in Ms. Aboraia's situation, having been instructed to the contrary, entertain the thought that something which cannot possibly be any sort of "income" be "unearned income?" To do so, one would have to assume for its validity that Ms. Aboraia should have lent greater credence to what DHR said she should have inferred from the language of their forms or from its representatives, reading the language on those forms to Ms. Aboraia, than she should have to the specific instructions given to her by DCFS. Logically, the opposite is true. Ms. Aboraia had no reason to believe that the Illinois officials were any less correct than the Alabama officials.

### (5) DCFS's Letter

The Court places great weight on Plaintiff's Exhibit 4, the April 24, 2009, letter from Mr. Corey Wiegand, Administrator of the Central Payment Unit of DCFS, to Ms. Aboraia's bankruptcy attorney. Plaintiff's Exhibit 4. In that letter DCFS concluded, right or wrong, that adoptive parent subsidies are not "income" for any purpose because they were ruled not "income" by the IRS. The Revenue Ruling which is the basis of DCFS's opinion reads, "The adoption payments made by the Maryland State Department of Social Services under these circumstances are disbursements from a general welfare fund in furtherance of the social welfare objectives of the State and are furnished to assist the adoptive parents in the care of the adopted child." Rev. Rul. 74-153, 1974-1 C.B. 20. Or, cutting to the chase, money that must strictly be used for the care of adopted children is not "income" for any purpose, including taxes. Hence, it was Mr. Wiegand's explanation that foster care and adoptive parent assistance is "income"

Case 08-00218-BGC    Doc 62    Filed 02/06/12    Entered 02/06/12 12:34:49    Desc Main
Document      Page 27 of 31

"under no circumstances" because, "the money they receive is for the care of the children." Plaintiff's Exhibit 4.[18]

      Ms. Aboraia testified, **"It was said to not include it as an income, you couldn't file taxes on it. So what else can I say?"** Transcript at 35.

      In this proceeding, the letter is the only evidence, other than Ms. Aboraia's testimony, of what DCFS purportedly told her about adoptive parent subsidies not being "income." Would it be reasonable at all to have expected Ms. Aboraia, as a lay person, absent clearer explanation, to have understood that something could be "income" for one purpose but not another. To the contrary, it would have been natural for her, or any other reasonable lay person for that matter, to have understood the term "income" to be generic, meaning the same thing under all circumstances. How could she have been expected to understand that money provided to her to use solely for the care of her foster/adoptive children was not "income" for income tax purposes but could be "income" for obtaining food assistance even though the adoptive parent assistance she was receiving was being used for precisely the same purpose under both circumstances, i.e., the care of her adopted children?

### (6) Summary

      In summary, the Court finds that Ms. Aboraia honestly believed that she did not have to list the adoptive parent subsidies she was receiving from DCFS as "unearned income" or to disclose those subsidies to DHR's representatives when they asked her about "unearned income." In addition, the Court finds that Ms. Aboraia had ample reason to believe that she did not have to list the adoptive parent subsidies she was receiving from DCFS as "unearned income" or to disclose those subsidies to DHR's representatives when they asked her about "unearned income." Therefore, her failure to list those subsidies on those forms as "unearned income" or to reveal those subsidies to the persons at that agency who asked her about "unearned income" cannot be considered fraudulent under section 523(a)(2)(A) or section 523(a)(2)(B). In this context, it is irrelevant whether she and DCFS were mistaken or not, or whether DCFS's instructions were loosely worded in a manner that misled Ms. Aboraia or not, or

---

[18] The argument could be made that Mr. Wiegand's reference to an IRS Ruling and Public Law in his letter was intended to say only that, in DCFS's opinion, foster care and adoptive parent subsidies are not income only for purposes of income taxes. But if that had been his intent, would he not have, for purposes of clarity, used the phrase "for purposes of income taxes" or the like, and thus appropriately limited his pronouncement, instead of the unlimited phrase "under no circumstances." Indeed, why would he have obfuscated the message by employing the phrase "under no circumstances" at all? Moreover, if DCFS used such unlimited language when communicating its message to Ms. Aboraia, would she, as a lay person, not have been justified in taking the "under no circumstances" language at face value and thus concluding, based on that language, that the subsidies she was receiving from that agency could constitute income "under no circumstances?"

Case 08-00218-BGC   Doc 62   Filed 02/06/12   Entered 02/06/12 12:34:49   Desc Main
Document   Page 28 of 31

whether she misinterpreted DCFS's poorly worded advice or not. The fact that Ms. Aboraia abided in good faith by her reasonable belief in the accuracy DCFS's instructions precludes the conclusion that she intended to either provide false information to DHR for the purpose of obtaining food assistance or withhold information from that agency that she knew would prevent her from receiving food assistance.

Therefore, based on the above, the Court finds that Ms. Aboraia did not intend to defraud the DHR. She simply did what any reasonable person would have done under the circumstances based on her understanding engendered by the instructions provided to her by DCFS and in the glaring absence of any particular instructions on the subject from DHR.

Consequently, the Court concludes that DHR failed to prove by a preponderance of the evidence that Ms. Aboraia made any representations or nondisclosures, written or verbal, for the purpose or intent of deceiving DHR into providing food assistance to her and her children. As such, DHR's 523(a)(2)(A) and section 523(a)(2)(B) arguments must be rejected.

## 2. DHR's Third Argument – Ms. Aboraia's Debt is a "Domestic Support Obligation" Nondischargeable Under Section 523(a)(5)

DHR's third argument is that Ms. Aboraia's debt for food assistance overpayment is not dischargeable pursuant to section 523(a)(5) of the Bankruptcy Code. That section excludes "domestic support obligations," as defined by 101(14A)(ii) of the Code, from a debtor's discharge. DHR contends that Ms. Aboraia's debt to it is such a "domestic support obligation." In addition, DHR contends that because the debt is a "domestic support obligation" it is entitled to priority under section 507(a)(1)(B) of the Code which grants such priority to, "allowed unsecured claims for domestic support obligations that, as of the date of the filing of the petition,... are owed directly to or recoverable by a governmental unit under applicable nonbankruptcy law...." 11 U.S.C.A. § 507(a)(1)(B).

As discussed below, the statutes on which DHR bases this final argument were not in existence when this case was filed, and their enactment date was well beyond the date Ms. Aboraia filed her Chapter 13 case and two days beyond the date the case was converted to Chapter 7. Therefore, they do not apply to the present proceeding.

Specifically, sections 101(14A)(ii), 507(a)(1)(B), and 523(a)(5) were added to the Bankruptcy Code by Sections 211, 212, and Section 215 of Public Law 109-8, The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. That law was enacted on April 20, 2005. Section 1501(a) of Public Law 109-8 provides, "this Act and the amendments made by this Act shall take effect 180 days after the date of enactment of this Act." Id. The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 216 (2005). That 180th day fell on October 17,

Case 08-00218-BGC    Doc 62    Filed 02/06/12    Entered 02/06/12 12:34:49    Desc Main
Document    Page 29 of 31

2005. Section 1501(b) of Public Law 109-8 provides that, "the amendments made by this Act shall not apply with respect to cases commenced under title 11, United States Code, before the effective date of this Act."

Ms. Aboraia filed her Chapter 13 case on June 4, 2004. She converted it to Chapter 7 on October 15, 2005. Both are prior to the effective date of Pub. L. 109-8.[19] Consequently, by virtue of the statutory prescription provided in Section 1501(b), sections 101(14A)(ii), 507(a)(1)(B), and 523(a)(5), as they presently exist, are expressly inapplicable to Ms. Aboraia's bankruptcy case. Those statutes, therefore, provide no basis for either precluding discharge of DHR's debt or granting that debt a priority status. "When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules." Landgraf v. USI Film Products, 511 U.S. 244, 280 (1994). See Cabello v. Fernandez-Larios, 402 F.3d 1148, 1153 (11th Cir. 2005)(same); Sarmiento Cisneros v. United States Atty. Gen., 381 F.3d 1277, 1280 (11th Cir. 2004)(same). "[W]here the congressional intent is clear, it governs." Kaiser Aluminum & Chemical Corp. v. Bonjorno, 494 U.S. 827, 837 (1990).[20]

### C. Ms. Aboraia Owes Nothing More to DHR But Is Not Due a Refund

As to what Ms. Aboraia owes DHR, the Court finds the prepetition portion of DHR's debt was eliminated by the discharge entered in Ms. Aboraia's Chapter 7 case on February 1, 2006. Therefore, she does not owe any of that amount. In contrast, the $770 in overpayments Ms. Aboraia received after October 15, 2005, did, however, constitute a postpetition debt that was unaffected by that discharge. But when, according to Mr. Stuart's testimony, Ms. Aboraia paid DHR $2,414.19, she paid more than enough to satisfy that nondischarged portion of the food assistance overpayment debt. Therefore, Ms. Aboraia does not owe that portion either. In all, Ms. Aboraia does not owe anything to DHR. The prepetition portion of its debt was extinguished by her discharge. The postpetition portion of that debt was paid.

---

[19] Even if Ms. Aboraia had converted her case to Chapter 7 on or after October 17, 2005, the result would be the same since conversion of a case, "does not effect a change in... the commencement of the case...," 11 U.S.C. § 348(a), as it does the date of the order for relief.

[20] In addition, as to DHR's "priority" argument, because this case is a no asset case, no distribution to unsecured creditors will be made. Consequently, the question of whether or not DHR's claim is entitled to priority status is moot.

30

The final point is of course that Ms. Aboraia asks the Court to compel DHR to disgorge the payments that she made to the extent those payments exceeded the postpetition portion of the debt that she formerly owed. Because she has neither suggested nor attempted to prove any legal basis for compelling DHR to disgorge that money, that request must be denied.

## VI. Conclusions

Based on the foregoing, the Court concludes:

1.       The part of the debt Ms. Aboraia owes DHR which accrued and was incurred by her prior to October 15, 2005, was discharged by the order of discharge entered pursuant to 11 U.S.C. § 727(a) in Bankruptcy Case No. 04-04941-BGC-7 on February 1, 2006, and was not otherwise proved to be nondischargeable;

2.       While the part of Ms. Aboraia's debt that accrued and was incurred by her after October 15, 2005, was technically not eligible for discharge, it has been paid in full and is therefore not owed;

3.       Ms. Aboraia's request to have DHR disgorge the payments that she made toward the satisfaction of her debt must be denied because she did not establish a legal basis for that relief;

4.       DHR's counterclaims are due to be denied <u>in toto</u> because it did not prove by a preponderance of the evidence that its debt is nondischargeable.

A separate order will be entered in conformity with this Memorandum Opinion.

Dated:  February 6, 2012                    /s/Benjamin Cohen_____
                                             BENJAMIN COHEN
                                             United States Bankruptcy Judge


BC:sm

Case 08-00218-BGC    Doc 62    Filed 02/06/12    Entered 02/06/12 12:34:49    Desc Main
Document    Page 31 of 31